Universal Consolidated Oil Company v. Commissioner.
Universal Consol. Oil Co. v. Commissioner
Docket No. 85372.
United States Tax Court
T.C. Memo 1961-246; 1961 Tax Ct. Memo LEXIS 96; 20 T.C.M. (CCH) 1285; T.C.M. (RIA) 61246; August 31, 1961
*96 Richard F. Alden, Esq., 900 Wilshire Blvd., Los Angeles, Calif., for the petitioner. Marion Malone, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax of $79,629.32 for 1956. The issues presented are (1) whether loans made by petitioner to its wholly-owned subsidiary became worthless in 1956; and (2) whether petitioner's investment in the capital stock of the subsidiary became worthless in 1956. Findings of Fact The stipulated facts are incorporated herein by reference. Petitioner is a California corporation with its principal office in Los Angeles. It filed its 1956 tax return on an accrual basis with the district director at Los Angeles. In August 1945, petitioner entered into negotiations with C. C. Cummings of Tulsa, Oklahoma, and his associates who were then undertaking the acquisition of the lessees' interests in certain oil leases in McClain County, Oklahoma. An informal written proposal by Cummings dated March 22, 1945 was accepted by petitioner and formalized in an agreement dated March 27, 1945. Under this agreement Cummings was to acquire certain oil *97 and gas leases covering approximately 1,400 acres in McClain County and was to be reimbursed by petitioner for costs incurred therein. Cummings was then to attempt to obtain a responsible operator to drill a test will. Both parties believed that this would be possible. If a suitable operator could not be obtained on terms acceptable to petitioner, then petitioner had the option to drill the well. All proceeds received from the project were to be applied first to reimburse petitioner for its costs including drilling costs if no operator could be found, and all further proceeds were to be divided between petitioner and Cummings; petitioner to get 50 per cent or if it had to drill, 75 per cent. Petitioner had intended in March 1945 to conduct the Oklahoma operations. However, when petitioner discovered that in order for a foreign corporation to qualify to transact business in Oklahoma it would be required to file its shareholders' list in a public office, it felt that this would not be in the best interests of the company, and a wholly-owned Oklahoma subsidiary, originally named Universal Consolidated Oil Company and later Universal Oil Company, was incorporated to carry out the Cummings *98 agreement and all other operations in Oklahoma. Petitioner paid $30,000 in cash for 3,000 shares of the subsidiary's $10 par value common stock during August 1945. An additional three shares were purchased as qualifying shares by the company's directors for $30 and later sold to petitioner for the same price. On September 27, 1945, the subsidiary acquired all the Cummings leases from petitioner. In connection with the acquisition of these leases the subsidiary executed a non-interest bearing demand promissory note dated July 20, 1945. This note was credited to the subsidiary's notes payable ledger account and carried by petitioner as a note receivable. The amount of the note, $65,212.42, represented the reimbursement which was due to Cummings and his associates for their expenses in obtaining leases in McClain County, and was paid directly to Cummings. Cummings was unable to obtain an acceptable operator to drill a test well and the subsidiary thereupon elected to drill a test well in accordance with the Cummings agreement. A company was employed by the subsidiary to drill the test well, under an agreement dated June 19, 1947. The test well, identified as the Moore #1, was centrally *99 located with respect to the leases acquired by Cummings in McClain County. Drilling operations started July 6, 1947. Further advances by petitioner to its subsidiary became necessary to meet the drilling costs. Such advances were made by petitioner in the form of checks payable to the subsidiary, as follows: November 5, 1946
$ 10,000
June 10, 1947
50,000
July 11, 1947
25,000
July 28, 1947
25,000
November 7, 1947
150,000
January 8, 1948
25,000
$285,000
These advances were recorded on the subsidiary's notes payable ledger account, although formal promissory notes were not executed. The petitioner recorded them as notes receivable. It was agreed that these advances would all be repaid promptly when and if oil was produced in paying quantities. Since March of 1945 valuable oil discoveries had been made on structures apparently similar to the one which was believed to exist in the McClain County block of leases held by the subsidiary. The geologist employed by petitioner who was also the geologist for Cummings and his Oklahoma associates, believed that despite the failure to find an operator, drilling was amply warranted in order to protect the original *100 investment. The test well, however, did not produce oil in commercially paying quantities. It was drilled to a depth of 11,968 feet. Drilling operations ceased on December 20, 1947. Between December 20, 1947 and February 1951, no further drilling operations were undertaken, but certain of the leases were retained by the payment of delay rentals. In December 1948 and January 1949 the subsidiary acquired the "Peters" lease which covered an area of 80 acres. Four separate leases representing the total undivided interests of all the landowners of this parcel were executed as follows: Date
Lessor
Lessee
Term
12-28-48
K. E. McAfee and Maxine M. McAfee et al
Sam Payne
5 years
1-19-49
Hazel S. Kee, guardian
Sam Payne
5 years
12-28-48
Opal L. Peters and H. C. Peters
Sam Payne
5 years
12-28-48
Sam Gordon and Lola Gordon
Sam Payne
5 years Lease bonuses totaling $6,432.08 were paid to the owners for the "Peters" lease. Delay rental was set at $80 per year for the entire 80 acres. In February 1951 the subsidiary acquired new leases on the "Peters" lease from the landowners. Five separate leases representing the total undivided interests of all the *101 landowners of this parcel were executed as follows: Date
Lessor
Lessee
Term
2-26-51
C. Plant
Sam Payne
5 years
2-26-51
Lola Gordon
Sam Payne
5 years
2-28-51
Hazel S. Kee, guardian
Sam Payne
3 years
2- 7-51
Opal L. Peters and H. C. Peters, et al.
Sam Payne
3 years
2- 7-51
K. E. McAfee and Maxine M. McAfee, et al.
Sam Payne
3 years Lease bonuses totaling $3,546.81 were paid to the owners for these five leases, and delay rental was set at $80 per year for the entire 80 acres. The Opal Peters lease and the McAfee lease expired on February 7, 1954, and the Kee lease expired on February 28, 1954. These three leases represented three-fourths of the undivided interest of the landowners of this property. The Plant lease and the Gordon lease represented one-fourth of the undivided interest of the landowners, and these two leases expired on February 26, 1956. The "Peters" lease was three miles east and nine miles south of the Moore #1 test, and in a different area from the drilling block which had been the subject of the Cummings agreement. One of the reasons this lease was taken was because of a proposed deep well test to be drilled in the area *102 by the Ashland Oil and Refining Company. The subsidiary agreed to make a $5,000 contribution to this test if it proved to be a dry hole. The well was drilled to 13,056 feet and proved to be dry in April 1952, whereupon the subsidiary paid $5,000 to Ashland as agreed. In 1953 the subsidiary needed additional funds in order to pay rent on certain of its leases which were retained in the belief they would still prove productive. On April 30, 1953, $5,000 was advanced by petitioner to enable the subsidiary to keep these leases alive. This advance was recorded by the subsidiary by a credit to its notes payable ledger account and carried by petitioner as a note receivable. On April 5, 1956, after petitioner's lease interests had expired, the Gulf Oil Company acquired five separate leases from the landowners of the "Peters" lease representing 54/80ths undivided interest in the property. From March 24, 1955 through May 11, 1956, Gulf Oil Company entered into seven oil and gas leases covering the 140 acres immediately to the north and adjacent to the so-called "Peters" lease and paid a lease bonus of not less than $50 per acre. On April 10, 1957, the Gulf Oil Company acquired three *103 additional leases on the "Peters" property representing the remaining 26/80ths undivided interest in the property. The net operating losses of the subsidiary are shown on its books as follows: 1945
$ 1,835.88
1946
4,000.71
1947
227,506.22
1948
43,435.97
1949
32,343.32
1950
17,509.40
1951
8,248.94
1952
6,920.36
1953
1,077.59
1954
7,735.03
1955
27,699.40
1956 (dissolved
6-4-56)
2,316.71
Total losses reported
$380,629.53 Petitioner filed a consolidated income tax return with its subsidiary for the year 1947 and claimed thereon the net operating loss of $227,506.22. No consolidated income tax returns were filed by petitioner for any of the other years. The balance sheet of the subsidiary as shown on its income tax return at December 31, 1955 shows the following: Universal Oil Company
Assets
Cash
$ 4,698.14
Depletable assets (leases)
1,738.76
Organization expense
482.70
Total Assets
$ 6,919.60
Liabilities and Capital
Notes payable
355,212.42
Reserve for losses
1,680.80
Auth. Common
Stock
$100,000.00
Unissued Common
Stock
69,970.00
Outstanding Com-
mon Stock
$ 30,030.00
30,030.00
Surplus
(380,003.62)
Total Liabilities and Capital
$ 6,919.60
*104 However, the balance sheet of the subsidiary as shown on its books at December 31, 1955, was as follows: Universal Oil Company
Assets
Undeveloped properties
$1,738.76
Cash in Bank
4,698.14
Prepaid Rentals
3.33
Deferred Charge
479.37
Total Assets
$6,919.60
Liabilities and Capital
Notes Payable
$6,919.60
Reserve for Losses
1,680.80
Auth. Common Stock
$100,000.00
Unissued Common
Stock
69,970.00
Outstanding Common
Stock
$ 30,030.00
Surplus
(31,710.80)
(1,680.80)
Total Liabilities and Capital
$6,919.60 The subsidiary reduced the liability shown on its books to petitioner as notes payable for advances from petitioner by its annual net operating losses. Petitioner made corresponding reductions on its books on its notes receivable account. In 1956 the board of directors of petitioner voted to dissolve and liquidate the subsidiary. Upon liquidation of the subsidiary its only asset was cash in the bank of $4,602.89, which was paid to petitioner by a check dated June 26, 1956. All the outstanding stock of the subsidiary was surrendered by petitioner for cancellation at the time of the liquidation. Petitioner on its return for 1956 claimed *105 a bad debt deduction of $123,103.31 representing loans to its subsidiary. The Commissioner disallowed the deduction and determined the loans were actually worthless prior to the year 1956. Petitioner also claimed a loss for worthless stock of $30,030 which represented its investment in the subsidiary. The Commissioner determined that the stock was actually worthless prior to 1956 and disallowed the loss. Opinion As disclosed by the findings of fact, petitioner made numerous loans to its whollyowned subsidiary from 1945 to 1953. The first issue presented is when did these loans become worthless. It is the contention of the Commissioner that the demand promissory note of $65,212.42 became worthless prior to 1956, the year in which petitioner claimed the deduction, because the statute of limitations if pleaded would have barred collection. With respect to the loans totaling $285,000 he contends that inasmuch as they were not founded upon written instruments, they also became unenforceable prior to 1956 and were therefore worthless before that year. The Commissioner concedes that the loan of $5,000 on April 30, 1953 was an enforceable obligation on January 1, 1956. The Commissioner *106 in the course of argument admits that there are cases which indicate that the availability of the statute of limitations as a defense against collection is not in itself sufficient evidence of the worthlessness of a debt. See and the cases cited therein. However, he claims that the reason for these decisions is that the statute does not operate automatically but must be pleaded in defense and concludes that if the evidence had shown that the statute would have acted as a bar to collection in such cases, then it would have been determinative of the year of worthlessness. He maintains that in the instant case the evidence firmly established that the statute would have barred collection if pleaded. Continuing with respect to the statute of limitations, the Commissioner says that even though a suit was not brought by petitioner to collect the indebtedness it may be accepted that the subsidiary would have pleaded its obvious defense of the statute of limitations. His premise is that in order for a loan to be bona fide the transaction must be at arm's length and dealings at arm's length presuppose that each entity will act in its own *107 best interest. In , (S.D.Fla. 1954) the court considered whether the mere running of the statute of limitations was sufficient to establish the worthlessness of a debt where there had been no material change in the debtor's financial conditions, and concluded that: The availability of such a defense to a debtor is not a sufficient ascertainment of worthlessness to justify a charge off of a note or other debt; the running of the statute of limitations does not extinguish a debt or render it worthless, but merely provides the debtor with an affirmative defense which may be pleaded in an action instituted against him for the collection of a debt. * * * The same situation existed in the case before us. No material change occurred in the subsidiary's financial condition, the only change was the running of the statute of limitations. The fact that petitioner formed the subsidiary to explore oil possibilities in Oklahoma is not in controversy and we think it is clear from the oral testimony at the hearing that even though the statute of limitations had run, petitioner "had substantial reason to think [it] might nevertheless eventually *108 get part payment." (C.A. 6, 1932). Our rejection of the Commissioner's argument that the running of the statute of limitations was the identifiable event which established the worthlessness of the debts prior to 1956, does not lift the burden of proof from petitioner. Petitioner still must prove that the debts actually became worthless during 1956. (C.A. 1, 1946). On January 1, 1956, the subsidiary had cash on hand of $4,698.14. In addition it still held an undivided one-fourth interest in the 80-acre Peters lease. The testimony of witnesses called by both the Commissioner and petitioner was to the effect that this leasehold interest had a fair market value which they approximated at $50 per acre, or a total value of $1,000 for the one-fourth interest. That Gulf Oil executed leases on the same property following the expiration of the subsidiary's leases corroborates this testimony. Even though the cash and leaseholds were the only assets of the subsidiary on January 1, 1956 and a liquidation at that time would only have permitted the recovery of a fraction of the monies advanced, *109 we think that such evidence clearly establishes that the debts were not completely worthless prior to 1956. Arguing further, the Commissioner takes a slightly different tack and claims that both petitioner and the subsidiary reduced the amount of the loans on their books to the extent of the subsidiary's operating loss for each year, which indicates that petitioner believed that the advances became worthless from year to year. Petitioner, as shown in the findings of fact, did file a consolidated return with the subsidiary in 1947 in which it claimed the $227,506.22 operating loss of the subsidiary as a deduction. However, there is no evidence in the record which indicates that petitioner made any attempt in subsequent years to take a partial deduction which would have required petitioner to comply with the statutory provisions with respect to the allowance of a deduction of a partially worthless debt. . The law is well settled that a "taxpayer who ascertained that he had suffered a partial bad debt loss might elect either to take an immediate deduction for the partial worthlessness, or, if he desired, wait until the debt was totally *110 worthless or until its ultimate disposition to take a deduction". . See also . Accordingly, on the worthless debt issue we hold for petitioner. The remaining question for decision concerns the deduction in 1956 by petitioner of $30,030 representing petitioner's capital investment in its wholly-owned subsidiary which it claimed as worthless stock. The deduction for worthless stock must be taken in the year when the stock becomes worthless. There is no partial deduction as in the case of a bad debt, and the deduction is lost if not taken in the year of worthlessness. . "[the] question of whether particular corporate stock did or did not become worthless during a given taxable year is purely a question of fact." . We are cognizant of the difficulty a taxpayer encounters in trying to pin down the loss to a precise year. Similarly, the Supreme Court in , said: The taxpayer points to the consequences *111 of error and other difficulties confronting one who in good faith tries to choose the proper year in which to claim a deduction. But these difficulties are inherent under the statute as now framed. Any desired remedy for such a situation, of course, lies with Congress rather than with the courts. It is beyond the judicial power to distort facts or to disregard legislative intent in order to provide equitable relief in a particular situation. In (C.A. 2, 1941), the Court of Appeals in commenting on the problem stated: In cases like this the taxpayer is at times in a very difficult position in determining in what year to claim a loss. The only safe practice, we think, is to claim a loss for the earliest year when it may possibly be allowed and to renew the claim in subsequent years if there is any reasonable chance of its being applicable to the income for those years. Petitioner predicates its argument that the stock became worthless in 1956 upon the proposition that as long as the subsidiary held the oil leases there was a probability of finding oil in sufficient quantities to repay the entire indebtedness of $355,212.42 and concludes *112 that the expiration in 1956 of the subsidiary's remaining leaseholds was the identifiable event which finally fixed the improbability that oil in commercial quantities would be obtained. This Court was confronted with the problem of ascertaining the year of worthlessness of stock in . After considering a number of cases on point, we concluded that From an examination of these cases it is apparent that a loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless *113 of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, wil depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable *114 hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. Where both these factors are established, the occurrence in a later year of an "identifiable event" in the corporation's life, such as liquidation or receivership, will not, therefore, determine the worthlessness of the stock, for already "its value had become finally extinct." * * * In cases where the stock has concededly lost any liquidating value in a certain year, but an event occurs in a subsequent year which the taxpayer claims is "identifiable," and where the Commissioner of Internal Revenue has determined that stock became worthless in the year in which it lost its liquidating value, then the taxpayer, in order to be entitled to the loss deduction in the latter year, has the burden of proving that, although the stock lost its liquidating value in the prior year, it contined to have a potential value until the occurrence of the event. * * * As we view the evidence presented we do not *115 think petitioner has established "that although the stock lost its liquidating value in [a] prior year, it continued to have a potential value" until the expiration of the leases in 1956. Under the facts presented it would have required the faith of "an incorrigible optimist" to have believed that oil would be found and the leases held by the subsidiary on January 1, 1956 would produce oil in sufficient quantities to discharge the subsidiary's indebtedness. . It follows that we hold the stock became worthless in some year prior to 1956. In which year it is unnecessary for us to decide. There is no necessary inconsistency in allowing the loss on the indebtedness and not the loss on the stock in the year in question. See . Decision will be entered under Rule 50.